**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,

        Plaintiff,                        Case No. 18-cr-87(1) (ADM/SER)

v.

Ihenvbiru Frank Iyamu,                       **REPORT AND**
                                                              **RECOMMENDATION**
        Defendant.

        Katharine T. Buzicky, Esq., United States Attorney's Office, Minneapolis, Minnesota, for Plaintiff.

        James E. Ostgard, Esq., Ostgard Law Office, Minneapolis, Minnesota, for Defendant.

        Steven J. Wright, Esq., Law Office of Steven J. Wright, Minneapolis, Minnesota, for Defendant.

STEVEN E. RAU, United States Magistrate Judge

        The above-captioned case comes before the undersigned on Defendant Ihenvbiru Frank Iyamu's ("Iyamu") Motion to Suppress Evidence Obtained as a Result of Searches and Seizures ("Motion to Suppress Evidence") [Doc. No. 35] and Motion to Suppress Confessions, Admissions or Statements Made in the Nature of Confessions Made by the Defendant ("Motion to Suppress Statement") [Doc. No. 36].[1] This matter was referred for resolution of pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1. For the reasons stated below, this Court recommends the Motion to Suppress Evidence be denied, and the Motion to Suppress Statement be granted in part and denied in part.

---

[1]     The Court refers to Iyamu's Motion to Suppress Confessions, Admissions or Statements made in the Nature of Confessions Made by the Defendant as a "Motion to Suppress Statement" instead of a "Motion to Suppress Statements." Iyamu's interrogation resulted in a lengthy statement to law enforcement officers instead of multiple statements made at different times.

## I. BACKGROUND

On April 18, 2018, a grand jury indicted Iyamu with one count of unauthorized access of a government computer in violation of 18 U.S.C. § 1030(a)(2). (Indictment) [Doc. No. 14]. On August 21, 2018, a grand jury issued a Superseding Indictment [Doc. No. 71] for Iyamu on one count of unauthorized access of a protected computer in violation of 18 U.S.C. § 1030(a)(4), one count of conspiracy to access a protected computer in violation of 18 U.S.C. § 371, and one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.

Iyamu filed several pretrial motions, including the Motions to Suppress. The Court held a hearing on August 6, 2018, where the Court heard testimony from one witness and received five exhibits into evidence. (Minute Entry Dated Aug. 6, 2018) [Doc. No. 40]; (Ex. & Witness List) [Doc. No. 41]; (Tr. of Hr'g) [Doc. No. 46]. The parties also submitted supplemental briefing on the Motions to Suppress. (Gov't Mem. in Opp'n to Def. Mots. to Suppress, "Gov't Mem. in Opp'n") [Doc. No. 37]; (Mem. of Law in Supp. of Mots. to Suppress, "Iyamu's Mem. in Supp.") [Doc. No. 48]; (Gov't. Response to Def.'s Mem. in Supp. of Mots. to Suppress, "Gov't Resp.") [Doc. No. 64].

Iyamu challenges probable cause in the search warrant, which was submitted as Government exhibit one. (Iyamu's Mem. in Supp. at 1). The Court evaluates this claim and determines the search warrant is supported by an Affidavit that contains probable cause.[2] *See* (Aff., Gov't Ex. 1). Iyamu then argues that his statement should be suppressed because it was not given voluntarily and because he invoked his right to counsel. (Iyamu's Mem. in Supp. at 1–2). The

---

[2]  The affidavit is signed by Special Agent Cole Ashcraft ("Special Agent Ashcraft," a special agent with the FBI who has been assigned to the United States Postal Service ("USPS") since 2013. (Aff. ¶ 2). Special Agent Ashcraft has training in computer science and investigation of computer crimes, including network intrusions. (*Id.*). His duties include investigating violations of federal laws regarding USPS property, the use of mail, and other postal offenses. (*Id.*).

Court analyzes the circumstances surrounding Iyamu's statement and concludes parts of the statement should be suppressed.

## II.   MOTION TO SUPPRESS EVIDENCE

Iyamu argues that all the evidence obtained during the search of the 847 Whisperwood Trail property should be suppressed because the search warrant "failed to show probable cause to believe that evidence of criminal activity would be found there." (Iyamu's Mem. in Supp. at 1). The search warrant is for physical evidence relating to certain listed crimes located at a specific property in Acworth, Georgia, identified in the search warrant (and Affidavit) as "Target Address 3." (Gov't Ex. 1 at Attach. A). Because the search warrant is supported by the Affidavit, the Court discusses them together. *See* (*id.*).

### A.   Facts

In his Affidavit, Special Agent Ashcraft states that since at least December 7, 2012, Iyamu and others have conspired to "facilitate a sprawling financial fraud scheme, defrauding victims by using multiple false pretenses . . . ." (Aff. ¶ 34). The conspirators would first send email "phishing messages" to "solicit personal information from unsuspecting users." (*Id.* ¶ 35). These emails were "crafted to appear as if they have been sent from a legitimate organization or known individual" and "entice[d] users to click on a link" where they were "asked to provide personal information, such as usernames and passwords." (*Id.*). These usernames and passwords were then used "to gain access to recipients' email accounts and send the large volumes of spam email messages necessary to lure prospective victims into the financial fraud scheme." (*Id.* ¶ 36).

On November 1, 2013, a Minnesota postmaster received and replied to a "fraudulent email purporting to be from the Postal Service's information technology help desk . . . ." (*Id.* ¶ 45). The postmaster's email account was accessed and used to send more than 14,000 emails to solicit

victims for a financial fraud scheme. (*Id.* ¶ 46). The emails stated, "a dying widow had decided to bequeath several million dollars to the recipient" and directed the recipient to provide bank information to an email one of Iyamu's co-conspirators controlled. (*Id.* ¶¶ 51, 52). Other United States Postal Service ("USPS") email accounts were also accessed without authorization and used to send similar fraudulent emails. (*Id.* ¶¶ 48, 54).

In 2017, USPS began requiring users to install software that collected information about devices connecting to its system. (*Id.* ¶ 65). Investigators found a computer with a Dell serial number that previously gained unauthorized access to USPS emails. (*Id.*). Dell's records showed it sold that particular computer on eBay to a user with the email address maryeddmore4[@]gmail.com—strikingly similar to the maryeddmore[@]yahoo.com address Iyamu noted on his visa application. (*Id.* ¶¶ 65, 37). The email used to buy the Dell computer also used the recovery phone number and email Iyamu listed on his visa application. (*Id.* ¶ 66). Special Agent Ashcraft found more than twenty-nine PayPal accounts registered to this Gmail account, "some of which had clear indications they were involved in this fraud scheme." (*Id.* ¶ 67). Investigators also obtained information from Google of about 100 Google accounts linked to Iyamu and a co-conspirator "because they used one of their known phone numbers or email addresses as a recovery phone number or email address . . . ." (*Id.* ¶ 71). When investigators corresponded undercover with co-conspirators in the fraud scheme, they received phone calls from the phone number listed on Iyamu's visa application. (*Id.* ¶ 62).

The conspiracy described "involved the use of laptop computers, . . . [m]obile phones [and], cellular hot spots . . . of a size and form factor that makes them readily transportable, in vehicles, hand-carried bags, or elsewhere on one's person." (*Id.* ¶ 86). Investigators knew Iyamu accessed email accounts associated with the fraud on his phone and had seen Iyamu transporting

his phone in a vehicle registered to him. (*Id.* ¶ 85). The Government conducted surveillance over a few weeks and saw Iyamu and the registered vehicle at Target Address 3, "with a pattern of activity consistent with residence, or at least frequent presence, at that location." (*Id.* ¶ 81).

The search warrant authorized the search of Target Address 3, vehicles located on the premises, and listed a multitude of electronic devices to seize from the premises. *See* (Gov't Ex. 1 at Attach. A).

### B.   Legal Standard

The Fourth Amendment provides for the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "To be valid, a search warrant must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, contraband, or a person for whose arrest there is probable cause may be found in the place to be searched." *Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998).

Where no evidence outside of the affidavit was submitted to the issuing judge, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (quoting *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)). The issuing judge's "determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates*, 462 U.S. 213, 236 (1983). In other words, "the duty of a reviewing court is simply to ensure that the [issuing judge] had a substantial basis for concluding that probable cause existed." *Id.* at 238–39.

"Probable cause means a 'fair probability that . . . evidence of a crime will be found in a particular place.'" *United States v. Chrobak*, 289 F.3d 1043, 1046 (8th Cir. 2002) (quoting *Illinois*

5

*v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007). In other words, "[p]robable cause exists when the facts and circumstances . . . are sufficiently trustworthy to warrant a person of reasonable caution to believe that a crime has been committed and that seizable property from that crime may be located at a particular place or on a person to be searched." *United States v. Gipp*, 147 F.3d 680, 687 (8th Cir. 1998). "Judges 'may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant . . . .'" *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)).

**C.     Analysis**

This Court finds the above facts establish probable cause. Specifically, the Government found links between the email and phone number listed on Iyamu's visa application, the Dell computer registered to Iyamu, and fraudulent activity taking place since 2012. USPS matched an individual gaining unauthorized access to a Dell computer. (Aff. ¶ 65). This Dell computer was bought with an email address similar to what Iyamu listed on his visa application. *See* (*id.* ¶¶ 37, 65). The email the computer was bought with also used a recovery email and phone number that Iyamu listed on his visa application. (*Id.* ¶ 66). Investigators also found clear indications of the Dell computer email account being connected to the fraud scheme because numerous PayPal accounts linked to the fraud were registered to this email. (*Id.* ¶ 67). Similarly, investigators had evidence that the phone number Iyamu listed on his visa application was linked to the fraud scheme because investigators received calls about the scheme from that number. (*Id.* ¶ 62).

Iyamu accessed email accounts under his control from his mobile, and Government surveillance showed Iyamu transporting his mobile in his vehicle and on his person. (*Id.* ¶ 86). The other electronic devices listed in the affidavit as likely connected to the fraud were also readily transportable. (*Id.*). Weeks of surveillance showed a car registered to Iyamu at Target Address 3 and showed a pattern of behavior consistent with Iyamu residing, or frequently present, at Target Address 3. (*Id.* ¶ 81).

Under these circumstances, this Court recommends the Motion to Suppress Evidence be denied because the Affidavit establishes probable cause existed that evidence regarding Iyamu's alleged fraud and conspiracy crimes would be found at Target Address 3.[3]

### III. MOTION TO SUPPRESS STATEMENT

Iyamu argues that his statement to law enforcement officers during his interrogation on March 14, 2018 should be suppressed under two grounds. Iyamu first argues that his statement was not given voluntarily under the circumstances of the interrogation. (Iyamu's Mem. in Supp. at 1). Iyamu then argues that his statement should be suppressed because he unambiguously invoked his right to counsel, which law enforcement officers ignored. (*Id.* at 2).

#### A. Facts

Special Agent Lemar A. Sims ("Special Agent Sims") and Special Agent Ashcraft

---

[3] The violations listed in the warrant are of 18 U.S.C §§ 371, 1001, 1028, 1029(a), 1030, 1341, 1343, 1349, and 1956. (Gov't Ex. 1). All the listed sections of the United States Code involve fraud and conspiracy to commit fraud.

interrogated Iyamu on March 14, 2018. (Gov't Ex. 5).[4] Iyamu states he was "subjected to a lengthy interrogation" after "at least six agents busted in the door and came in with their guns drawn on him" and that he was "scared." (Iyamu's Mem. in Supp. at 7). The Government states Iyamu "clearly understood his rights and agreed to speak with the agents." (Gov't Resp. at 9). The Government also states there is no evidence of the special agents using "coercion, deception, or intimidation to compel a statement from Iyamu." (*Id.* at 10).

Special Agent Sims provided Iyamu a written *Miranda* waiver and explained the waiver to Iyamu. (*Id.*); *see also* (Gov't Ex. 4 at 3:6–5:16). The parties identify three instances Iyamu mentions an attorney during his interrogation. First, Iyamu asked if he had the right to consult an attorney. (Gov't Ex. 4 at 5:19–20). Special Agent Sims stated that Iyamu could consult an attorney "at any time," even after they started the interview. (*Id.* at 5:21–24). Iyamu next asked if he could talk to his lawyer before he commented on questions about his computer. (*Id.* at 39:5–8). Special Agent Sims told Iyamu it was his choice and asked Iyamu if he was terminating the interview or wanted to discuss something else. (*Id.* at 39:9–40:22). Iyamu chose to switch topics and Special Agent Sims moved on to asking about who was involved in the conspiracy. (*Id.*). Iyamu then stated he "would like to talk to [his] lawyer" after being asked about email fraud. (*Id.* at 43:20–44:7). In this instance, Special Agent Sims asked Iyamu if he was "terminating the complete interview" or if he "want[ed] to talk about something else," to which Iyamu responded that he wanted to talk to

---

[4] As mentioned above, Special Agent Ashcraft works for the FBI and has been assigned to the United States Postal Service since 2013. (Aff. ¶ 2). Special Agent Ashcraft has training in computer science and investigation of computer crimes, including network intrusions. (*Id.*). His duties include investigating violations of federal laws regarding USPS property, the use of mail, and other postal offenses. (*Id.*).

Special Agent Sims is also a special agent with the FBI, who helped Special Agent Ashcraft interview Iyamu. (Gov't Ex. 4 at 2:2–4). This Court has no further information about Special Agent Sims's specialties or training.

8

his lawyer about the fraud but would answer any other questions. (*Id.* at 44:14–25). While Iyamu references an attorney at other times, this Court focuses on the three instances the parties identify in their briefing.

Special Agent Ashcraft also described the circumstances of Iyamu's interrogation at the motion hearing. *See* (Tr. of Hr'g). Special Agent Ashcraft stated that Iyamu referenced an attorney in several instances and that at times it was "unclear" what Iyamu was asking for. (Hr'g Tr. at 19:6–17). In at least two instances, Iyamu was asked "whether he wanted to end the interview, or whether he wanted to discuss something else . . . ." (*Id.* at 19:15–24). Special Agent Ashcraft testified that Iyamu chose to speak about another topic when given these options. (*Id.* at 19:20). He further testified that he asked Iyamu multiple times if Iyamu needed a break, water, or the restroom. (Tr. of Hr'g at 20:4–12).

### B.  Legal Standard

#### 1.  Voluntary Statement

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. The Supreme Court adopted measures to ensure that a suspect is advised of her or his Fifth Amendment rights before custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). "To determine if a confession is voluntary . . . Court[s] will look at the totality of the circumstances, examining the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his will easily to be overborne." *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir. 1987). In other words, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *see also Beecher v. Alabama*, 389

9

U.S. 35, 36 (1967) (finding an involuntary confession where the defendant confessed after being threatened with a loaded gun pressed to his face); *Brooks v. Florida*, 383 U.S. 413, 414–15 (1967) (finding an involuntary confession where the defendant confessed after being left naked in a small cell with little food for two weeks).

### 2. Invoking Right to Counsel

The Fifth Amendment also demands that when an accused has "expressed his desire to deal with the police only through counsel," the interrogation must end, unless the accused "initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). An accused's request for counsel must be sufficiently clear, such that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994). While it may be "good police practice" for an officer to clarify any ambiguous statement made by the accused, it is not required. *Id.* at 461. Supreme Court precedent does not require the cessation of questioning "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect **might** be invoking the right to counsel." *Dormire v. Wilkinson*, 249 F.3d 801, 805 (8th Cir. 2001).

"[A] limited invocation of the right to counsel does not preclude the admissibility of statements a defendant makes which fall outside the limited invocation." *United States v. Boyer*, 9714 F.2d 144, 146 (8th Cir. 1990) (citing *Connecticut v. Barret*, 479 U.S. 523, 529 (1987)). In determining the contours of the conditions under which the suspect will speak without counsel, the Court must give effect to the "ordinary meaning" of the words used to limit the invocation. *Connecticut*, 479 U.S. at 529–30 (determining that while courts are "'require[d] to give a broad, rather than a narrow, interpretation to a defendant's request for counsel,'" courts need not disregard

"the ordinary meaning" of an invocation (quoting *Michigan v. Jackson*, 475 U.S. 625, 633 (1986))).

### C.  Analysis

#### 1.  Voluntary Statement

Iyamu first argues that his statement must be suppressed because it was not given voluntarily. (Iyamu's Mem. in Supp. at 1). This Court finds Iyamu's statement voluntary because there is no doubt Iyamu understood and waived his *Miranda* rights before the interrogation began. Special Agent Sims explained Iyamu's *Miranda* rights on two different occasions. Special Agent Sims first read aloud verbatim the rights explained in the pre-printed *Miranda* form given to Iyamu and asked Iyamu if he understood those rights.[5] Iyamu responded, "I understand." (Gov't Ex. 4 at 4:4). Special Agent Sims then read aloud the portion of the pre-printed form acknowledging that

---

[5]  Because the Transcript that makes up Government Exhibit 4 is lengthy, the Court quotes larger portions of the Transcript in the footnotes. Sims stated:

> "Frank Iyamu has been advised by Special Agent Lamar A. Sims . . . who has identified himself to me as a special agent of the Postal Service OIG, and that he is conducting a criminal investigation. I've also been advised that I have the right to remain silent. Any statements I make can be used as evidence against me in a court of law or another proceeding, including administrative proceedings. I have the right to consult with an attorney prior to and during any questioning. If I cannot afford an attorney, one will be appointed to me by a court without cost. If I decide to answer questions now, I still have the right to stop answering questions at any time." So you can stop answering questions at any time. Do you understand that? . . . These five things that I just read to you, Frank, do you understand these things? Do you need me to go over them again, or do you understand?

(Gov't Ex. 4 at 3:6–4:3) (reading aloud the pre-printed *Miranda* form submitted as Government Exhibit 5).

11

Iyamu understood these rights.[6] When Iyamu did not respond affirmatively that he understood, Special Agent Sims re-read the acknowledgment to Iyamu. (Gov't Ex. 4 at 5:7–16). Special Agent Sims then explained to Iyamu, "if you decide that you want to talk to an attorney, then you can at any time." (*Id.* at 5:22–24). After this discussion of Iyamu's *Miranda* rights, Iyamu signed the *Miranda* form acknowledging his rights. (Gov't Ex. 5).

This Court also finds Iyamu's statement voluntary because there is no sign of the "coercive police activity [that] is a necessary predicate" to find an involuntary confession. *See Colorado*, 479 U.S. at 167. The facts in *Beecher* and *Brooks*, where the Supreme Court found involuntary confessions because of coercive police activity, were dramatic. In *Beecher*, the defendant confessed after being threatened with a loaded gun pressed to his face by the police chief. *Beecher v. Alabama*, 389 U.S. 35, 36 (1967). In *Brooks*, the defendant confessed after being left naked in a small cell for two weeks with a daily ration of eight ounces of water and twelve ounces of soup. *Brooks v. Florida*, 383 U.S. 413, 414–15 (1967). The facts here stand in stark contrast. The recording does not show special agents Sims and Ashcroft yelling or threatening Iyamu in any way. *See* (Gov't Ex. 2). Their tone was conversational. *See* (*id.*). Special Agent Ashcraft asked Iyamu if he was thirsty and wanted a glass of water. (Gov't Ex. 4 at 88:16–21). Special Agent

---

[6] Sims:

> "I've read my rights or had them read to me as set forth above. I understand my rights. With this understanding, I'm willing to make a statement and answer questions. I do not wish to consult an attorney at this time, and I do not wish to have an attorney present during this interview. I understand and know what I'm doing. No promises or threats have been made to me, and no coercion of any kind is being used against me." Do you understand all that, Frank? Okay. Do you understand that we're not threatening you or forcing you to do anything?

(*Id.* at 4:19–5:5 (reading aloud the pre-printed *Miranda* submitted as Government Exhibit 5)).

Sims then asked Iyamu if he wanted any food from his fridge downstairs. (*Id.* at 93:5–8). Iyamu was also asked if he needed to take a break or use the restroom multiple times. (*Id.* at 92:10–11; 93:10–11; 158:3–6). Under these facts, this Court finds no evidence of law enforcement officers coercing Iyamu into making an involuntary confession.

This Court therefore finds no evidence of Iyamu's statement being involuntary and ample evidence that the statement was voluntary. The facts show that Iyamu was explained his *Miranda* rights on multiple occasions and that he voluntarily made his statement after signing a waiver of those rights. The facts also show no sign of law enforcement officers creating a coercive environment; in fact, the special agents here offered Iyamu food and asked him multiple times if he needed the restroom or a break. Under these circumstances, this Court recommends that the Motion to Suppress Statement be denied on the grounds that Iyamu's statement was made involuntarily.

### 2.     Invoking Right to Counsel

Iyamu also argues that his statement must be suppressed because of his unambiguous requests for counsel that were not honored during the interrogation. (Iyamu's Mem. in Supp. at 1). This Court finds Iyamu made a limited invocation of his right to counsel part way through the interrogation. The parties cite to three instances of Iyamu invoking his right to counsel.

Iyamu first mentioned counsel by asking "I have a right to consult an attorney?" (Gov't Ex. 4 at 5:19–20). Iyamu's assertion was not a clear and unambiguous request for counsel that Special Agent Sims was required to stop his interrogation. Special Agent Sims had just explained Iyamu's right to consult with an attorney. *See* (*id.* at 5:7–16). In these circumstances, Special Agent Sims could have reasonably believed Iyamu was inquiring after his right to call a lawyer, instead of Iyamu actually requesting counsel. *See* (*id.* at 5:7–20). This is supported by the

13

testimony of Special Agent Ashcraft, who was also present during the interview, that it was "unclear" whether Iyamu wanted to end the interview or talk about something else. (Tr. of Hr'g at 19:14–17). Indeed, Special Agent Sims likely thought Iyamu was inquiring after his right to counsel because Special Agent Sims answered, "once we get started, if you decide that you want to talk to an attorney, then you can at any time." (Gov't Ex. 4 at 5:21–23).

In *Dormire*, the Eighth Circuit held that the defendant's statement "Could I call my lawyer?" was not an unambiguous request for counsel because under the circumstances, a reasonable officer could have believed the suspected was "merely inquiring whether he had the right to call a lawyer." *Dormire*, 249 F.3d at 805. The *Dormire* court noted how other circuits had not found an invocation of counsel when the defendants phrase a request for counsel as a question. *Id.* Iyamu too phrased his request for counsel as a question rather than an affirmative statement. (Gov't Ex 4 at 5:19–20). The *Dormire* court also noted that the law enforcement officer affirmatively told the defendant he could call an attorney instead of preventing him from doing so. *See id.* Similarly, here, Special Agent Sims did not prevent Iyamu from seeking counsel, and, in fact, emphasized Iyamu's right to seek counsel at any time. (Gov't Ex. 4 at 5:21–23).

Iyamu next mentioned counsel when Special Agent Sims asked Iyamu about his computer. Special Agent Sims asked Iyamu "What sort of stuff do you use that computer for?" (*Id.* at 39:5–6). Iyamu responded, "So can I talk to my lawyer about that before I can comment?" (*Id.* at 39:7–8). Again, Iyamu did not make an unambiguous and unequivocal invocation of his right to counsel. Iyamu posed his statement as a question and a law enforcement could interpret the statement as Iyamu inquiring after his right to counsel. In fact, Special Agent Sims likely thought this because he responded to Iyamu's question by saying, "It's up to you . . . [A]re you terminating the interview, or do you want to talk about something else?" (*Id.* at 39:9–12). Iyamu did not choose to

14

terminate the interview and instead stated "I'd like to talk about something else." (*Id.* at 39:13–14). Again, because Iyamu phrased his statement about counsel as a question, and chose not to terminate the interview, this Court does not find a limited or general invocation of Iyamu's right to counsel.

Even if Iyamu's question was an invocation of counsel, as Iyamu argues, it would be a limited invocation. Special Agent Sims posed the question, "[w]hat sort of stuff do you use that computer for?" (*Id.* at 39:5–6). Iyamu specifically asked if he could to his lawyer "about that" before he commented. (*Id.* at 39:7–8). While Iyamu does not specify what "that" is, the Court finds it logical that Iyamu referred to the topic of the question just posed to him—what he used his computer for. If this was an invocation, it would be a limited invocation that only protected portions of the statement where Iyamu discussed how he used his computer. But the special agents did not re-visit the topic of how Iyamu used his computer. Instead the special agents moved on to asking Iyamu who else was involved in the conspiracy. *See* (*id.* at 39:13–25). Because the special agents did not re-visit the topic, Iyamu did not make any statements related to this alleged invocation. Thus, even if there was a limited invocation, it cannot protect any parts of Iyamu's statement.

Iyamu mentioned counsel for a third time when he was asked about how his fraud scheme works, and he answered "[I]n that case, I would like to talk to my lawyer about it." (*Id.* at 44:6–7). Special Agent Sims asked Iyamu if he was terminating the interview or would like to talk about something else. *See* (*id.* at 44:14–15). Iyamu responded that he would like to talk to his lawyer "concerning the fraud[,] [b]ut if there's any other questions I . . . can give you my answers." *See* (*id* at 44:17–25). With this response, Iyamu invoked his right to counsel regarding questioning about the fraud. Unlike the first two instances, Iyamu did not phrase his request for an attorney in

15

the form of a question; there is no doubt that Iyamu wanted to speak to his attorney before responding to questioning regarding the fraud. Iyamu also repeated he wanted to talk to his lawyer about the fraud but was willing to answer questions on other topics.[7] This Court finds Iyamu's responses an unambiguous, limited invocation of Iyamu's right to counsel.

This Court rejects both parties' arguments on the parameters of Iyamu's limited invocation. The Government references two instances Iyamu mentions an attorney and argues Iyamu made a conditional invocation of his right to counsel on anything "related to (1) the computer and other items in the adjacent room, and (2) the way the phishing scam actually worked." (Gov't Resp. at 11). Iyamu only addresses two instances he mentioned counsel and argues that his first request was conditional while the second request covered the entire investigation. (Iyamu's Mem. in Supp. at 10). This Court finds Iyamu's position on the invocation too lenient and the Government's too restrictive.

---

[7] Sims explained his understanding of how the fraud scheme worked and asked Iyamu if it was accurate. (Gov't Ex. 4 at 43:16–44:5). The following exchange then occurred:

> Iyamu: Well, in that case, I would like to talk to my lawyer about it.
> Special Agent Ashcraft: Okay.
> Iyamu: Yeah.
> Sims: Okay.
> Iyamu: That's just . . .
> Sims: Okay. Okay. So it's totally up to you. Are you terminating the complete interview, or do you want to talk about something else? It's up to you.
> Iyamu: Concerning that, I will have to talk to my lawyer - -
> Sims: Okay.
> Special Agent Ashcraft: Okay.
> Iyamu: - - I mean, concerning the fraud. But if there's any other questions, I will - -
> Special Agent Ashcraft: Okay.
> Iyamu: - - can give you my answers.

(*Id.* at 44:6–25).

16

This Court gives a broad interpretation to the defendant's invocation while giving effect to the ordinary meaning of "fraud" that Iyamu used to limit his invocation. *See Connecticut*, 479 U.S. at 529–30 (citing *Michigan*, 475 U.S. at 633). When Special Agent Sims asked Iyamu about how the phishing scheme works, Iyamu did not respond he wanted to talk to his lawyer about the phishing scheme specifically. Instead, Iyamu stated twice that he wanted to speak to his attorney about the more general term "fraud." (Gov't Ex. 4 at 44:6–25).

In context of this interrogation, the special agents used the word "fraud" in a multitude of contexts. Special Agent Sims referenced "fraud" when asking about the accounts Iyamu used for various schemes.[8] Similarly, "fraud" was also used when discussing the phishing schemes where Iyamu allegedly sent emails about a dying widow bequeathing money to lure recipients to provide personal financial information.[9] The phishing schemes were referred to as an example of the fraud Iyamu allegedly committed. (Gov't Ex. 4 at 43:20–44:5). Iyamu was asked how he spent the

---

[8]     For example, Sims asks Iyamu how much he received from the fraud: "if you had to put a number on it in terms of the fraud aspect, the money that you guys were getting from the accounts and from the e-mails and stuff . . . ." (*Id.* at 116:2–7).

[9]     For example, in a portion of the Transcript before Iyamu's limited invocation, Sims asks Iyamu:

> So to - - the fraud involves getting people to send you and some other people['s] money, right, through a variety of means? And to get them to do that you send them some - - or someone sends them some e-mail saying you might have inherited some money or you've won a lottery . . . And then somewhere in there, they're asked for money or to pay a fee or something like that. Is that - - is that about accurate?

(*Id.* at 43:20–44:5). While this portion appears before Iyamu's limited invocation, Sims's statements show that he referred to the phishing schemes as fraud. Immediately after this exchange, Iyamu asks to talk to his lawyer "concerning the fraud." (*Id.* at 44:6–21).

money from the "fraud," including whether he bought a luxury car from the money.[10] The special agents also asked Iyamu whether the "fraud" was all his idea or whether others were involved.[11] These are only a few examples of how the special agents used the word "fraud" during this interrogation. If the special agents referred to so many aspects of Iyamu's alleged crimes using the word "fraud," it is only logical to believe that Iyamu associated "fraud" with all these topics as well. Thus, this Court finds that portions of the statement related to Iyamu's accounts, phishing schemes, co-conspirators, motives—and anything else that appears to be about the "fraud"—should be suppressed after Iyamu's limited invocation.

The Government only seeks to introduce specific parts of Iyamu's statement, and therefore the Court will only address these parts. One requested portion is before the invocation occurs. (Gov't Ex. 2:1–39:6). This Court recommends denying Iyamu's Motion to Suppress Statement on this portion because Iyamu's invocation only covers parts of the statement made about the "fraud" after his invocation. The Court also recommends denying Iyamu's Motion to Suppress Statement on the following portions of the transcript: 55:12–58:25, 59:8–25, 60:1–21, 65:8, 66:1–69:7, 73:23–74:1, 74:7–75:20, 80:5–84:6, 84:10–85:5, 86:11–87:10, 109:19–110:12, 120:22–122:1, 152:24–153:8. These requested portions of Iyamu's statement should not be suppressed because they do not concern the fraud; instead these portions of the transcript relate to Iyamu's background, unrelated crimes, and other topics. This Court recommends granting Iyamu's Motion to Suppress

---

[10] For example, Special Agent Ashcraft asks "[s]o the Mercedes you said is purchased with money from - - from the fraud, right?" (*Id.* at 110:13–14).

[11] For example, Special Agent Ashcraft states to Iyamu: "She [your ex-wife] had a part in . . . the fraud; that we know for sure." (*Id.* at 47:18–21). Similarly, Sims asks Iyamu "as it relates to the fraud, was it all your idea?" (*Id.* at 49:25–50:1). While the Government does not intend to introduce these sections of the Transcript, these sections show how the word "fraud" was being used to refer to co-conspirators in the conversation between Iyamu and the special agents.

Statement with respect to the following requested portions of the transcript: 59:1–7, 63:19–64:2, 65:9–25, 69:17–72:9, 73:12–22, 74:2–6, 75:21–76:7, 84:7–9, 85:6–86:10, 110:13–111:10, 115:9–117:21, 117:22–119:2, 122:2–5, 143:2–7, and 146:10–148:7. These portions should be suppressed because they reference fraud exactly, or similarly to, the way the special agents discussed fraud with Iyamu. This Court therefore recommends that Iyamu's Motion to Suppress Statement be granted in part and denied in part.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Ihenvbiru Frank Iyamu's ("Iyamu") Motion to Suppress Evidence Obtained as a Result of Searches and Seizures [Doc. No. 35] be **DENIED**.

2. Iyamu's Motion to Suppress Confessions, Admissions or Statements Made in the Nature of Confessions Made by the Defendant be **GRANTED in part and DENIED in part** consistent with this Report and Recommendation.

Dated: September 24, 2018

*s/ Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge

### Notice

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).