## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

           Plaintiff,

v.

Ihenvbiru Frank Iyamu,

           Defendant.

**MEMORANDUM OPINION AND ORDER**
Criminal No. 18-87(1) ADM/SER

---

Katharine T. Buzicky and Robert M. Lewis, Assistant United States Attorneys, United States Attorney's Office, Minneapolis, MN, on behalf of Plaintiff.

James E. Ostgard, Esq., Ostgard Law Office, Minneapolis, MN, and Steven J. Wright, Esq., Law Office of Steven J. Wright, Minneapolis, MN, on behalf of Defendant.

---

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for consideration of Defendant Ihenvbiru Frank Iyamu's ("Iyamu") Objection [Docket No. 77] to Magistrate Judge Steven E. Rau's September 24, 2018 Report and Recommendation ("R&R") [Docket No. 73]. In the R&R, Judge Rau recommends denying Iyamu's Motion to Suppress Evidence Obtained as a Result of Search and Seizure ("Motion to Suppress Evidence") [Docket No. 35], and granting in part and denying in part Iyamu's Motion to Suppress Statement [Docket No. 36]. After a de novo review of the record, and for the reasons stated below, Iyamu's Objection is granted in part and denied in part.

## II. BACKGROUND

### A. Superseding Indictment

Iyamu is charged in a Superseding Indictment [Docket No. 50] with one count of unauthorized access of a protected computer in violation of 18 U.S.C. § 1030(a)(4), one count of

conspiracy to access a protected computer in violation of 18 U.S.C. § 371, and one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. The Superseding Indictment alleges that from about 2012 to 2017, Iyamu and two co-defendants (collectively, "Defendants"), all citizens of Nigeria, engaged in a scheme and conspiracy to commit mail and wire fraud, identity theft, money laundering, and fraud against the United States and other victims. Superseding Indictment ¶ 1. Defendants sent fraudulent "phishing" emails to unsuspecting recipients who were misled into providing sensitive information such as user names and passwords. Id. ¶ 2. The user names and passwords were then used to gain access to the recipients' email accounts and to send emails from those accounts to prospective victims of the fraud scheme. Id. ¶ 5.

One of the phishing email recipients misled into providing information was a U.S. Postmaster in Minnesota who responded to a fraudulent email in November 2013. Id. ¶ 3. Using the information from the Postmaster, Defendants gained access to Postal Service computer servers that processed the Postal Service's email traffic. Id. ¶¶ 3–4. From November 2013 to April 2017, Postal Service email accounts were used to send emails to intended victims of the scheme. Id. ¶ 5. Defendants caused victims to send hundreds of thousands of dollars via bank transfers, Western Union, MoneyGram, PayPal, and other means. Id.

**B. Search Warrant**

On March 13, 2018, federal agents obtained a search warrant authorizing the search of a home in Acworth, Georgia. See Gov't Ex. 1 ("Search Warrant"). The search warrant was based on the March 13, 2018 affidavit of Cole Ashcraft ("Agent Ashcraft"), a Special Agent with the U.S. Postal Service Office of Inspector General. Id. at 00003443–86 ("Ashcraft Aff."). The

affidavit described the fraudulent scheme and stated that a laptop computer with a Dell serial number had gained unauthorized access to the to the Postal Service email accounts. Ashcraft Aff. ¶ 65. The laptop associated with the Dell serial number had been purchased on eBay by a user with an email address that was strikingly similar to that on Iyamu's visa application. Id. ¶¶ 65–66. The purchaser's email account included a recovery phone number and email address that matched those listed on Iyamu's visa application. The purchaser paid for the laptop using a PayPal account. Id. The phone number associated with the PayPal account matched the phone number on Iyamu's visa application. Id. Investigators corresponded undercover with co-conspirators in the scheme and received calls from the telephone number listed on Iyamu's visa application. Id. ¶ 62.

The affidavit further averred that investigators surveilled a home in Acworth, Georgia for several weeks and saw Iyamu repeatedly visit the house in a pattern "consistent with residence, or at least frequent presence." Id. ¶ 81. A vehicle registered to Iyamu was also frequently parked outside the home. Id. Investigators also observed Iyamu talking on a cell phone and transporting the phone in a vehicle. Id. ¶ 85. Investigators knew that Iyamu used his phone to access email accounts associated with the fraud. Id. The affidavit also stated that mobile phones and laptops were used in the conspiracy and were "readily transportable" due to their size. Id. ¶ 86.

## C. Search Warrant and Arrest

At 6:00 a.m. on March 14, 2018, Agent Ashcraft and five to seven additional federal agents executed the search warrant at the Acworth address. Hr'g Tr. [Docket No. 46] at 8–12, 22. After knocking on the door and getting no response, the agents forced entry into the home

3

with their weapons drawn. Id. at 23. They entered on the home's first level and saw Iyamu descending the stairs from the second level. Id. at 11, 23. The agents arrested him pursuant to a federal complaint filed in this district. Id. at 8. The agents searched the home and found a laptop computer with an attached iPod, multiple cellular hotspots, several identification cards, and other items. Id. at 10–11.

**D. Interrogation**

After arresting Iyamu, Agent Ashcraft and Special Agent Lamar A. Sims ("Agent Sims") questioned him in an upstairs bedroom. Id. at 12. The agents began by providing Iyamu with a written Miranda waiver form and reading his Miranda rights to him. Gov't Ex. 4 ("Interrogation Tr.") at 3; Gov't Exs. 3, 5. Agent Sims then asked, "Do you need me to go over them again, or do you understand?" Interrogation Tr. at 4. Iyamu replied, "I understand." Id.

Before signing the waiver form, Iyamu asked, "If I cannot – I have a right to consult an attorney?" Id. at 5. Agent Sims responded "Yeah, at any time. At any time. So once we get started, if you decide that you want to talk to an attorney, then you can at any time. But once we get this form completed here, then we'll tell you everything, what's going on." Id. Iyamu initialed and signed the form to indicate that he had been advised of his Miranda rights and that he understood them and chose to waive them. Id. at 4–6; Gov't Ex. 5.

The agents first questioned Iyamu about his background, including his name, how long he had been in the United States, marital status, family living arrangements, and occupation. Interrogation Tr. at 8–37. Agent Sims then told Iyamu to "[t]ell us what you think this is all about." Id. at 38. Iyamu replied, "Well, it's not – I understand it's about a fraud." Id. Sims responded, "Right." Id.

4

Soon after this exchange, Agent Ashcraft informed Iyamu that agents searching the home found a computer, cellular hotspots, and several identification cards belonging to other people. Id. Agent Ashcraft asked: "What sort of stuff do you use that computer for?" Id. at 39. Iyamu responded: "Okay. So can I talk to my lawyer before I comment?" Id. Agent Sims replied, "It's up to you. . . . [A]re you terminating the interview, or do you want to talk about something else?" Id. Iyamu answered: "Yeah, I'd like to talk about something else." Id.

The agents then asked Iyamu to explain how he "got into" what he was doing. Id. at 41–42. In responding to this question, Iyamu twice used the phrase "the fraud." Id. at 42–43. Agent Ashcraft then gave the following description of his understanding of the fraud and asked Iyamu to confirm whether it was correct:

> [T]he fraud involves getting people to send you and some other people money, right, through a variety of means? And to get them to do that you send them some – or someone sends them some e-mail saying you might have inherited some money or you've won a lottery or like a romance thing, like it's boyfriend/girlfriend type of thing online. And then it starts up sort of a relationship conversation. And them somewhere in there, they're asked for money to pay a fee or something like that. Is that – is that about accurate?

Id. at 43–44. Agent Ashcraft's question elicited the following exchange:

> IYAMU: Well in that case, I would like to talk to my lawyer about it.
> ASHCRAFT: Okay.
> IYAMU: Yeah.
> SIMS: Okay.
> IYAMU: That's just . . .
> SIMS: Okay. Okay. So it's totally up to you. Are you terminating the complete interview, or do you want to talk about something else? It's up to you.
> IYAMU: Concerning that, I will have to talk to my lawyer –
> SIMS: Okay.
> ASHCRAFT: Okay.
> IYAMU: -- I mean, concerning the fraud. But if there's any

5

other questions, I will --
            ASHCRAFT:   Okay.
            IYAMU:      -- can give you my answers.

Id. at 44.

Agent Ashcraft then told Iyamu to "turn it around" and asked Iyamu if he had any questions for them. Id. at 45. Iyamu asked how the investigation started and mentioned his ex-wife. Id. at 46. The agents assured Iaymu that the investigation did not originate with his ex-wife, and told him that other agents were at his ex-wife's house that moment because they knew she was involved in "the fraud." Id. at 47. Agent Sims then offered a theory for why Iyamu may have gotten involved in "the fraud," and asked Iyamu: "I guess the only question I have for you is — or one of the only questions is, as it relates to the fraud, was it all your idea? I think we know the answer, but was it all your idea, in terms of starting everything; or did someone bring you into it just like we thought?" Id. at 49–50.

The agents continued to interrogate Iyamu for approximately two more hours, referencing the fraud numerous times. The agents' questions included who else was involved in the fraudulent scheme, whether Iyamu had engaged in the fraud before coming to the United States, how the scheme worked, whether Iyamu recognized the names of other suspected fraud participants, whether he used his phone to share information about the fraud, how much money Iyamu and the other fraud participants made from the scheme, and whether Iyamu had purchased his car with proceeds from the fraud. See id. at 50–172.

Late in the interrogation, Agent Ashcraft asked: "How do you find the people who have the accounts, and how do you get that relationship so that they'll send you the stuff?" Id. at 172. Iyamu answered, "You know, those are most of the things I need to talk to my lawyer about."

Id.  Agent Ashcraft then stated that they were "stopping the recording and – because [Iyamu] is requesting an attorney."  Id.

The entire interrogation lasted approximately 2 ½ hours.  During this time, Iyamu was given water and the opportunity to eat and use the restroom.  Id. at 88, 92–93.

Iyamu filed a Motion to Suppress Evidence, arguing that the search warrant was issued without probable cause to believe that the house contained evidence of criminal activity.  Iyamu also filed a Motion to Suppress Statement, arguing that his statement was not voluntary and that his requests for counsel were not honored during the interrogation.

The Government argued that the search warrant was supported by probable cause and was also protected by the good-faith exception recognized in United States v. Leon, 468 U.S. 897 (1984).  The Government further argued that Iyamu's statement was voluntary, and that his invocation of his right to counsel was limited to "the fraud."  Implicitly acknowledging that Iyamu's right to counsel had been violated during some portions of the interrogation, the Government did not argue for a complete denial of the Motion to Suppress Statement.  Rather, the Government argued that 15 excerpts from the interrogation do not concern the fraud and thus fall outside the scope of Iyamu's limited invocation.

The R&R recommends denying the Motion to Suppress Evidence because the search warrant was based on probable cause.  The R&R also recommends denying in part the Motion to Suppress Statement because Iyamu:  (1) knowingly and voluntarily waived his right to counsel at the beginning of the interrogation; (2) did not invoke his right to counsel until he stated that he would have to talk to his attorney about the fraud; and (3) limited his invocation to matters concerning the fraud.  The R&R recommends not suppressing any of the statements Iyamu made

before he invoked his right to an attorney concerning the fraud, and also not suppressing 13 excerpts occurring after this invocation. The R&R opines that the excerpts are unrelated to the fraud because they address Iyamu's background, unrelated crimes, and other topics which fall outside the limits of Iyamu's invocation of his right to counsel.

## III. DISCUSSION

### A. Standard of Review

In reviewing a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); see also D. Minn. L.R. 72.2(b). A district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id.

### B. Objections

#### 1. Motion to Suppress Evidence

Iyamu objects to the R&R's finding of a sufficient nexus between Iyamu's alleged illegal activities and the Acworth home. "A showing of probable cause requires evidence of a nexus between the contraband and the place to be searched." United States v. Skarda, 845 F.3d 370, 376 (8th Cir. 2016) (quotations omitted). Probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place given the circumstances set forth in the affidavit." United States v. Tellez, 217 F.3d 547, 549 (8th Cir. 2000) (quotations omitted).

Upon conducting a de novo review, the Court agrees with the R&R's conclusion that the affidavit established a sufficient nexus between the fraudulent activity and the Acworth

8

residence.  The affidavit averred that:  the unauthorized accesses at the Postal Service were linked to a Dell computer bought on eBay by a user whose recovery email and phone number matched those on Iyamu's visa application; undercover investigators received phone calls about the fraudulent scheme from Iyamu's phone number; the electronic devices used for the fraud were readily transportable; Iyamu was seen transporting his mobile phone in his vehicle; and Iyamu and his vehicle were frequently at the Acworth house.  These circumstances establish probable cause to believe that evidence of Iyamu's alleged fraud would be found at the Acworth residence.

### 2.  Motion to Suppress Statement

Iyamu also objects to the R&R's recommendation that portions of his statement not be suppressed.  Iyamu contends that his entire statement must be suppressed because it was not voluntary, and because the investigating agents violated his Fifth Amendment right to counsel by ignoring his repeated requests for an attorney.

#### a.  Voluntariness of Waiver

Iyamu objects to the conclusion in the R&R that his statement was voluntary.  He argues that his status as an immigrant in this country with no experience in the United States' criminal justice system, combined with the terror he experienced at having multiple officers force their way into the home with guns drawn at 6:00 a.m., prevented him from knowingly and voluntarily waiving his rights under Miranda v. Arizona, 384 U.S. 436 (1966).

In Miranda, the Supreme Court established that "a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins."  Davis

v. United States, 512 U.S. 452, 457 (1994) (citing Miranda, 384 U.S. at 444-45). A defendant's waiver of his Miranda rights must be made voluntarily, knowingly, and intelligently. Miranda, 384 U.S. at 444. When determining whether a waiver was made voluntarily, knowingly, and intelligently, the court considers two "distinct dimensions":

> First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The Government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004). A finding of police coercion is "a necessary prerequisite to a determination that a waiver was involuntary." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (emphasis omitted).

In assessing whether a waiver was voluntary, a court examines the totality of the circumstances to determine whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010). Relevant circumstances include "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

Here, there is no evidence that Iyamu's waiver resulted from coercive police conduct. To the contrary, the audio recording and transcript of the interrogation establish that the tone of the

interrogation was conversational and the agents did not use threats or violence. Although the agents initially entered the home with their guns drawn, there is no argument, nor any evidence, that they used their guns in a threatening manner during the interrogation.

Additionally, there is no indication that Iyamu's status as a relatively recent immigrant prevented him from voluntarily waiving his Miranda rights. The agents informed Iyamu of his rights orally and in writing. Iyamu asked contextually appropriate questions about his rights before stating orally and in writing that he understood them. Significantly, Iyamu later did invoke his Miranda rights during the interrogation, further demonstrating that he knew and understood those rights and that his will to exercise them was not overborne. The Court thus agrees with the conclusion in the R&R that Iyamu voluntarily, knowingly, and intelligently waived his Miranda rights.

### b. Invocation of Right to Counsel

Iyamu objects to the R&R's conclusion that his request to speak with counsel "concerning the fraud" was a limited invocation of counsel that did not apply to the entire interrogation. Iyamu further argues that even if the request was limited, the R&R erred in concluding that some excerpts from his statement fall outside the parameters of his invocation.

Miranda requires that once a suspect "states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 474. To invoke the Miranda right to counsel, a suspect must unambiguously request an attorney. Davis, 512 U.S. at 459. In other words, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal

11

in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," the officers are not required to stop the interrogation. Id. (emphasis in original). For example, in Dormire v. Wilkinson, the Eighth Circuit held that a defendant's statement "Could I call my lawyer?" was not a clear and unambiguous request to have counsel present, because the officer could have reasonably believed that the defendant "was merely inquiring whether he had the right to call a lawyer, rather than believing that [defendant] was actually requesting counsel." 249 F.3d 801, 805 (8th Cir. 2001).

Additionally, a suspect may limit his request for counsel to certain areas of questioning. See, e.g., Connecticut v. Barrett, 479 U.S. 523, 529 (1987) (finding the suspect invoked his Miranda right to counsel for written statements but not oral statements); United States v. Jacobs, 97 F.3d 275, 280 (8th Cir. 1996) (finding the suspect's request for counsel was limited to taking a polygraph test); United States v. Boyer, 914 F.2d 144, 146 (8th Cir. 1990) (finding the suspect's request for counsel was limited to making a tape-recorded phone call). "[A] limited invocation of the right to counsel does not preclude the admissibility of statements a defendant makes which fall outside the limited invocation." Boyer, 914 F.2d at 146. In determining the parameters of a suspect's limited invocation, a court must give effect to the "ordinary meaning" of the words used to limit the invocation. Barrett, 479 U.S. at 530. If the suspect's words would be ambiguous to an ordinary person, "the 'settled approach to questions of waiver . . . requires [a court] to give a broad, rather than a narrow, interpretation to [the suspect's] request for counsel.'" Id. at 529 (quoting Michigan v. Jackson, 475 U.S. 625, 633 (1986)).

The R&R concluded that Iyamu's first two references to an attorney—when he was given

12

his Miranda rights and when he was asked about his computer—were not clear and unambiguous requests for counsel because Iyamu's statements were posed as questions, and because Iyamu chose to continue with the interrogation rather than terminate it. R&R at 13–15. The R&R concluded that under these circumstances, a reasonable officer could have believed that Iyamu was merely asking whether he had a right to counsel, rather than actually requesting counsel. Id. Iyamu has not objected to these conclusions and the Court agrees that these references were not clear requests for counsel under the circumstances.

The R&R further found that Iyamu's statement that he would like to talk to his attorney before answering questions concerning the fraud was a clear invocation of the right to counsel. R&R at 16. However, the R&R found that the invocation was limited because Iyamu stated that he was willing to answer questions on other topics. Id.

The Court respectfully disagrees that Iyamu's invocation of his right to counsel at this point in the questioning was limited. The sole reason the agents searched the home and arrested Iyamu was because they believed he was participating in a "sprawling financial fraud scheme." Ashcraft Aff. ¶ 34. During the interrogation, the agents confirmed that their purpose for being there was to investigate the fraud. When Agent Sims asked Iyamu to "[t]ell us what you think this is all about," Iyamu answered, "Well, it's not – I understand it's about a fraud," and Agent Sims responded, "Right." Interrogation Tr. at 38. Because the interrogation was "all about" the fraud, Iyamu's invocation of counsel for questions "concerning the fraud" was all-inclusive. Id. at 38, 44. Although Iyamu also stated "if there's any other questions, I will . . . give you my answers," there was no motivation for officers to ask "other questions" if the agents could not ask about the fraud. Id. at 44. Thus, when Iyamu stated that he wanted to talk to his lawyer

13

concerning the fraud, the agents should have ceased questioning him.

Iyamu's broad invocation covering the full scope of the interrogation is distinguishable from cases where defendants were found to have invoked only a limited right to counsel. See, e.g., Barrett, 479 U.S. at 529–30; Jacobs, 97 F.3d at 280. In those cases, the limitations on the invocation were clearly delineated and applied only to discrete portions of the interrogations. For example, in Barrett, the suspect told officers that he was unwilling to make a written statement without his lawyer present, but had "no problem" talking about the incident. 479 U.S. at 525–26. The Supreme Court held that the suspect's limited invocation applied only to written statements. Id. at 529–30. Similarly in Jacobs, the suspect stated that if he were to be given a polygraph test he wished to have counsel present. 97 F.3d at 280. The Eighth Circuit held that this limited invocation did not extend to the suspect's interrogation because he was not given a polygraph test. Id. In contrast, the purpose for which Iyamu requested counsel—the fraud—covered the entire scope of the interrogation. Accordingly, all statements made after this invocation must be suppressed.

Even if Iyamu's invocation could somehow be construed as limited, the agents undeniably ignored this limitation and continued to ask him about the fraud for nearly two additional hours. It is impossible to know whether Iyamu would have made any of the statements elicited in the 13 excerpts if the agents had respected the boundaries of Iyamu's invocation and reined in their interrogation to conform to those limits. Based on the officers' clear and repeated disregard for the limits Iyamu placed on his willingness to speak without counsel, all post-invocation excerpts must be suppressed.

The 13 post-invocation excerpts must be suppressed for the additional reason that nearly

all of them do relate to the fraud. Some of the excerpts involve a discussion about Iyamu's application for a visa, including whether the phone number and email address listed on the application were his. Interrogation Tr. at 55–57. This discussion concerns the fraud because the search warrant affidavit prepared by Agent Ashcraft states that the email and phone number associated with the fraudulent activity matched the email and phone number on Iyamu's visa application. Ashcraft Aff. ¶¶ 62, 65–66. Several excerpts involve questions about suspected co-conspirators, including Iyamu's ex-wife, an individual named Endurance "Eddie" Balogun, and others. Interrogation Tr. at 55–60, 65–69, 73–75, 85–87, 120–122, 152–53. Another excerpt concerns Iyamu's education in computers, which is relevant to the allegations that Iyamu was using his computer to commit fraud. Id. at 80–83. Yet another excerpt involves questions about Iyamu's purchase of a Mercedes, which is relevant because the agents believed the car may have been purchased with fraudulent proceeds. Id. at 86.

For the above reasons, all statements made after Iyamu's invocation of his right to an attorney for matters concerning the fraud must be suppressed.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Iyamu's Objection [Docket No. 77] to the Report and Recommendation is **GRANTED IN PART** and **DENIED IN PART**;

2. The Report and Recommendation [Docket No. 73] is **ADOPTED IN PART** and **DECLINED IN PART**;

3. Iyamu's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 35] is **DENIED**; and

4. Iyamu's Motion to Suppress Statement [Docket No. 36] is **GRANTED IN PART**

15

and **DENIED IN PART** consistent with this Memorandum Opinion & Order.

BY THE COURT:

　　　s/Ann D. Montgomery　　
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: December 20, 2018.